UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ELLEN H. DECOTIIS of the Town of Bar Mills, County of York, State of Maine,<br><br>    Plaintiff<br><br>v.<br><br>LORI WHITTEMORE of the Town of Falmouth, County of Cumberland, State of Maine, individually and in her official capacity as Director of Child Development Services–Cumberland,<br><br>CHILD DEVELOPMENT SERVICES-CUMBERLAND, a local educational agency formed under state and federal law,<br><br>and<br><br>DEBRA HANNIGAN of Augusta, Kennebec County, State of Maine in her official capacity as State Director of Child Development Services,<br><br>    Defendants | Civil Action No.:<br>JURY TRIAL DEMANDED |

**COMPLAINT**
(Injunctive Relief Requested)

Plaintiff ELLEN H. DECOTIIS, through her attorney, states for her complaint the following:

INTRODUCTION

1.    This is an action brought under 42 U.S.C. §1983 for declarative and injunctive relief and for punitive damages arising out of retaliation against Plaintiff, in her capacity as a speech-language therapist formerly providing services under contract with Defendant Child Development Services-Cumberland, for the exercise of speech protected by the First

Amendment to the United States Constitution.

## PARTIES

2. Plaintiff ELLEN H. DECOTIIS is a speech-language pathologist and speech-language therapist licensed by the State of Maine Board of Speech-Language Pathology, Audiology, Hearing Aid Dealing and Fitting. She has a Certificate of Clinical Competence from the American Speech- Language- Hearing Association (ASHA) and is a member in good standing of the Maine Speech-Language Hearing Association, which she served as President for six years.

3. Defendant LORI WHITTEMORE, who is sued in both her personal and official capacity as Director of Child Development Services- Cumberland County, is personally responsible for the retaliation complained about in this Complaint

4. Defendant CHILD DEVELOPMENT SERVICES – CUMBERLAND ("CDS-Cumberland") is a local school administrative unit created by state and federal law under the general supervision of the Maine Department of Education to provide services under the Federal Individuals with Disabilities Education Act, P.L. 105-17, 20 U.S.C. 1401, et seq. ("IDEA").

5. Defendant DEBRA HANNIGAN, who is sued in only her official capacity, is the State Director of the Child Development Services system.

## JURISDICTION and VENUE

6. This action seeks to redress violations of Plaintiffs' rights secured by the United States Constitution and laws and regulations of the United States.

7. The Court's jurisdiction over this action is conferred by 42 U.S.C. § 1983, 28 U.S.C. §§ 1331 and 28 U.S.C. §1343(a)(3).  Declarative and injunctive relief is authorized by 28

U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

8. Venue properly lies in this Court under 28 U.S.C. § 1391(b).

## THE CHILD DEVELOPMENT SERVICES SYSTEM

9. The State of Maine Child Development Services ("CDS") is a system of Intermediate Educational Units created under the laws of the State of Maine, 20-A M.R.S.A. §7001, et seq., IDEA and Federal Regulations of the United States Department of Education, 34 C.F.R. Parts 300 and 303, that provide both Early Intervention for birth – two years (Part C Services) and Free Appropriate Public Education ("FAPE") for ages three-five years (Part B Services) for children with disabilities under the supervision of the Maine Department of Education.

10. The CDS system provides Early Intervention and Special Education programming for children with special needs in the areas of Physical ( Gross/Fine Motor Skills), Cognitive, Communication (Speech and Language), Social/Emotional, and Adaptive Development.

11. The CDS system consists of fifteen regional sites, each under the management of a director appointed by the State Director, a State Office and a State Level Advisory Committee comprised of one member from each regional site. Each regional CDS site has a board of directors and provides services to preschool children with disabilities under contracts with the Maine Department of Education.

12. The State CDS maintains a central data management system, a system-wide policies and procedures and provides centralized fiscal services for the regional sites.

13. Each regional site is an Intermediate Educational Unit separate from the local

school system.

14. Each of the regional sites is responsible for their population of children in need of Early Intervention or Special Education programs through collaboration with CDS staff, providers, families, schools, medical facilities and other agencies.

15. CDS services are generally provided by contract with individual providers, such as the Plaintiff in this case.

16. The Individualized Family Service Plan ("IFSP") is a plan for children with disabilities age birth through age 2 and the Individualized Education Plan ("IEP") is a plan for children with disabilities age 3 and higher and these plans are the legal documents that authorize federal and state funds for services for CDS eligible children.

17. Once a child has been screened and evaluated, the regional CDS site will convene a IFSP Team or IEP Team (previously referred to as an Early Childhood Team ) Meeting to determine eligibility for services pursuant to a IFSP or IEP. These Teams are made up of the parents, a case manager from the regional CDS and others, such as evaluators and providers.

18. After an IFSP or an IEP is established, the IFSP and IEP Teams may meet to extend or modify services for the child with disabilities.

19. Prior to the final adoption of the Maine Unified Special Education Regulations, Birth to Age 20, Chapter 101 on May 16, 2008, CDS services for pre-school children with disabilities (age birth through five years old) were regulated under separate regulations of the Department of Education, Chapter 180, whereas children with disabilities age 5 and higher were governed by an earlier version of Chapter 101.

20. Under the prior Chapter 180, the duration of CDS services for eligible children

with disabilities was for the length of time specified in the child's IFSP or IEP and generally was based on a calendar year. The IFSP or the IEP would be reviewed and adjusted on an annual basis. After the adoption of the Unified Rule 101, the duration for CDS services for ages 3-5 were established on a school year calendar, ending June 30 and beginning again in September, with no services planned for the summer except for children who are eligible for Extended School Year Services ("EYS").

21.     After the adoption of Unified Rule 101, for a child with disabilities ages 3-5 to receive services in the summer, the IEP Team would have to qualify the child for under Chapter 101, Section X.2.A.7 for EYS.

22.     After this change in the rules, the State CDS adopted a policy that EYS services would be the exception and not the rule and that EYS services would be provided only if a child's IEP Team determines, on an individualized basis, that services are necessary for the provision of FAPE to the child.

23.     The transition to the new Unified Chapter 101 and the policy of the State CDS concerning EYS services caused confusion and concern on the part of the regional CDS sites, providers of services and parents of children with disabilities throughout the State in 2008.

24.     One of the sources of concern was the absence of a clear procedure outlining the objective data requirements to support the need for EYS.

## FACTUAL ALLEGATIONS

25.     Plaintiff has been providing speech and language therapy and evaluations for children in therapy for regional CDS sites for approximately 18 years under contracts with various CDS sites. In 2008, Plaintiff was working under contracts for CDS-Cumberland,

CDS-Norway and CDS-York for speech and language therapy and evaluations of children with disability ages 3-5.

26. Plaintiff had previous problems with the CDS-Cumberland site.

27. In 1997, Plaintiff was the President of the Maine Speech-Language Hearing Association, in which position she spoke in criticism of certain aspects of the then current CDS system and advocated for legislative and regulatory changes.

28. As a result of this activity, Plaintiff was notified in June 1997 that her contract with CDS-Cumberland would not be renewed because she had allegedly developed an "adversarial relationship" with this CDS and because she had been "testifying too much."

29. Following the initial decision not to renew her contract, CDS-Cumberland informed Plaintiff that she would be granted a six month renewal of her contract provided she satisfied conditions, including a requirement that she communicate only with the Director of the CDS-Cumberland site about problems she may have with that site.

30. CDS-Cumberland withdrew from this position and renewed Plaintiff's contract only after the Maine Civil Liberties Union threatened to bring suit against CDS-Cumberland for violating the Free Speech rights of Plaintiff under the First Amendment to the United States Constitution.

31. In early 2008, Plaintiff was informed by CDS sites in Norway and York how requests for EYS services would be evaluated under the new United Chapter 101 Regulations expected to be adopted.

32. CDS-Cumberland gave no guidance to providers for evaluation of eligibility for EYS services for children ages 3-5 under the new regulations.

33. For her caseload of children covered by CDS-Cumberland, Plaintiff sent in her routine quarterly reports in March, 2008 and included recommendations for EYS services.

34. Plaintiff expected that she would then be notified by CDS-Cumberland of IEP Meetings to review these recommendations and make decisions about EYS services, which was the procedure followed in other CDS sites.

35. Plaintiff was not notified by CDS-Cumberland about the scheduling of an IEP meeting to consider EYS services.

36. In the Spring of 2008, Plaintiff learned from Defendant Whittemore, case managers at CDS-Cumberland and from parents of children covered by CDS-Cumberland that:

    a. Children served by CDS-Cumberland probably would not be receiving EYS services unless they were in the category of severely disabled.

    b. CDS-Cumberland would not qualify children for EYS services with single services (i.e., speech therapy only).

    c. There was confusion about standards for regression/recoupment for purposes of qualifying children for EYS from CDS-Cumberland.

    d. CDS-Cumberland would not accept Plaintiff's evaluations for EYS because Defendant Whittemore did not trust Plaintiff's clinical judgment because she was recommending EYS services too often.

    e. CDS-Cumberland case workers were making decisions about the eligibility of children for EYS services before an IEP meeting.

    f. IEP Meetings to discuss eligibility for EYS services were not being regularly scheduled and were held only when parents insisted on them. CDS-Cumberland case workers were resisting holding a meeting because of their view the children would not be eligible.

37. As a result of the foregoing, Plaintiff was confused and concerned about whether CDS-Cumberland was properly operating in compliance with state and federal requirements for CDS services.

38. Plaintiff inquired with Defendant Hannigan concerning the inconsistency between the way her CDS-Cumberland caseload of children were being treated and the way her caseload with other regional CDS agencies were being handled.

39. Defendant Hannigan informed Plaintiff that she could "not account for the differences you have referred to" but the concern and confusion continued.

40. In response to all of this, Plaintiff contacted the Southern Maine Parents Awareness ("SMPA"), a private advocacy group giving support to parents with children with disabilities, and the Disability Rights Center ("DRC"), a federally funded, statewide advocacy group for people with disabilities for assistance on how EYS services should be evaluated under the new CDS regulations. These organizations advised that CDS-Cumberland did not appear to be in compliance with state and federal requirements under IDEA.

41. Plaintiff also posted a notice of the name and telephone number of SMPA and DRC in her office for the benefit of parents because the parental rights form given to parents by CDS-Cumberland had listed an incorrect number for DRC.

42. Plaintiff also informed parents of children she was treating that she was confused and concerned about the criteria CDS-Cumberland was using for eligibility for EYS services and that parents should contact SMPA and DRC for guidance concerning their rights under IDEA.

43. In May 2008, Defendant Whittemore called Plaintiff to complain that Plaintiff was "out to get her" with the advice she was giving parents about contacting advocacy groups and then Defendant Whittemore hung up the phone.

44. By letter dated July 29, 2008, Plaintiff was informed, without explanation, that CDS- Cumberland had decided not to renew her contract due to expire on September 1, 2008.

45. Later, in November, 2008, Plaintiff's attorney complained to the Maine Attorney General's Office about the contract non-renewal and her attorney was informed that Plaintiff's contract was not renewed based on CDS-Cumberland's view about Plaintiff's pattern of subpar performance, including but not limited to failure to submit quarterly reports on several children she was serving, the poor quality of the progress reports that she did submit, and the absence of measurable data supporting her recommendations.

46. These reasons were a pretext. Prior to November 2008, Plaintiff was unaware of these views by CDS-Cumberland and Plaintiff continues to provide speech-language therapy for other CDS sites, which have not made such complaints to her.

47. The true reason for CDS-Cumberland's non-renewal of Plaintiff's contract in 2008 was in response to advice that Plaintiff gave to parents of children she was providing services to that they should consult with the advocacy groups concerning positions that CDS-Cumberland was taking on the eligibility of EYS services to their children.

48. The non-renewal of Plaintiff's contract with CDS-Cumberland resulted in a substantial reduction in Plaintiff's practice.

## CAUSES OF ACTION

### COUNT I
(Deprivation of Rights Under the First Amendment- Defendant Lori Whittemore)

49. Plaintiff reallges and incorporates herein by reference paragraphs 1- 48 of the Complaint.

50. When Plaintiff gave advice to parents of children receiving services through CDS-Cumberland to contact disability advocacy groups because of the confusion and concern about the eligibility of children ages 3-5 to receive EYS services, she was (a) acting as a citizen

(b) on a matter of public concern and (c) therefore was engaging in speech entitled to protection under the First Amendment of the United States Constitution.

51. The topic of Plaintiff's speech was a matter of inherent, statewide concern for parents whose children were receiving Special Education services from regional CDSs under IDEA in the Spring of 2008.

52. Defendant Whittemore was motivated by retaliation against the exercise by Plaintiff of her First Amendment rights when she terminated Plaintiff's contract to provide speech-language therapy and related evaluations services to CDS-Cumberland effective at the end of August 2008.

53. In making the decision to terminate Plaintiff's contract, Defendant Whittemore was a "person" and was acting "under color of state law" within the meaning of 42 U.S.C. § 1983.

54. In terminating Plaintiff's services in retaliation of Plaintiff's exercise of speech, Defendant Whittemore deprived Plaintiff of rights protected by the United States Constitution.

55. As a result of the conduct of Defendant Whittemore, Plaintiff suffered monetary damages.

56. The constitutional rights of Plaintiff to exercise her First Amendment rights without retaliation were clearly established at the time Plaintiff's contract was not renewed,

57. The actions of Defendant Whittemore in depriving Plaintiff of rights under the United States Constitution were motivated by actual malice or was conduct from which malice can be implied from the reckless or callous indifference of Defendant Whittemore to Plaintiff's federally protected rights.

WHEREFORE, Plaintiff seeks the following relief:

A. Declare that the non-renewal of Plaintiff's contract with CDS-Cumberland by Defendant Whittemore deprived Plaintiff of rights secured by the First Amendment of the United States Constitution;

B. Award of damages against Defendant Whittemore in such amounts proved at trial;

C. Award of punitive damages against Defendant Whittemore;

D. Award injunctive relief requiring Defendant CDS-Cumberland to reinstate Plaintiff's contract;

E. Award injunctive relief prohibiting CDS- Cumberland from retaliation for Plaintiff's protected Speech and from bringing this action;

F. Award of attorneys fees under 42 U.S.C. §1988; and

G. Order such other and further relief as is just and reasonable.

## COUNT II
(Deprivation of Rights Under the First Amendment- Defendant CDS-Cumberland)

58. Plaintiff reallges and incorporates herein by reference paragraphs 1- 57 of the Complaint.

59. Defendant CDS-Cumberland is a local public agency that provides Special Education services in accordance with IDEA that does not enjoy the immunities of a state under 42 U.S.C. §1983.

60. Defendant Whittemore was acting pursuant to a practice, custom or policy of CDS-Cumberland when she terminated the services of Plaintiff in retaliation of the exercise by Plaintiff of her First Amendment rights.

61. Alternatively, CDS-Cumberland acted with deliberate indifference to the constitutionally protected rights of Plaintiff when it failed to train its Director concerning the

prohibition of retaliating against the exercise of Free Speech of CDS-Cumberland providers.

62. After CDS-Cumberland had attempted to engage in the very same conduct when it attempted to terminate Plaintiff's service in 1997, the need to train CDS-Cumberland's director to prevent her from engaging in similar conduct was or should have been obvious to a reasonable person.

63. The policy, custom or practice of CDS-Cumberland, or alternatively, its failure to train, was the moving force behind the deprivation of the First Amendment rights of Plaintiff.

WHEREFORE, Plaintiff seeks the following relief:

A. A Declaration that the non-renewal of Plaintiff's contract with CDS-Cumberland by Defendant Whittemore and CDS-Cumberland deprived Plaintiff of rights secured by the First Amendment of the United States Constitution;

B. An award of damages against Defendant CDS-Cumberland in such amounts proved at trial;

D. Award injunctive relief requiring Defendant CDS-Cumberland to reinstate Plaintiff's contract;

E. Award injunctive relief prohibiting CDS- Cumberland and its officers from retaliation for Plaintiff's protected Speech and from bringing this action;

F. Award of attorneys fees under 42 U.S.C. §1988; and

G. Order such other and further relief as is just and reasonable.

## COUNT III
(Deprivation of Rights Under the First Amendment- Defendant Debra Hannigan)

64. Plaintiff reallges and incorporates herein by reference paragraphs 1- 63 of the Complaint.

65. Defendant Debra Hannigan, as State Director of the CDS system in Maine, is "person" acting "under color of state law" within the meaning of 42 U.S.C. § 1983 when she

exercises her responsibilities to review and guide the conduct of regional CDS sites.

66. In this capacity she has a duty to review and monitor conduct of CDS-Cumberland's conduct that would violate the First Amendment rights of CDS system providers.

66. Defendant Hannigan breached this duty when she failed to prevent Defendant CDS-Cumberland and Defendant Lori Whittemore from violating the First Amendment rights of Plaintiff.

WHEREFORE, Plaintiff seeks the following relief:

A. Declare that Debra Hannigan breached a duty to prevent the non-renewal of Plaintiff's contract with CDS-Cumberland by Defendant Whittemore in deprivation of deprived Plaintiff's rights secured by the First Amendment of the United States Constitution;

B. Award injunctive relief requiring Defendant Debra Hannigan to prevent CDS-Cumberland and its officers from violating the First Amendment rights of its providers, including the Plaintiff.

C. Award of attorneys fees under 42 U.S.C. §1988; and

D. Order such other and further relief as is just and reasonable.

Dated: August 7, 2009

/s/ Rufus E. Brown
_____
Rufus E. Brown, Esq.
BROWN & BURKE
85 Exchange Street - P.O. Box 7530
Portland, ME 04112-7530
(207) 775-0265
rbrown@brownburkelaw.com

                          Zachary L. Heiden, Esq.
                          MCLU FOUNDATION
                          401 Cumberland Avenue, Suite 105
                          Portland, ME 04101
                          (207) 774-5444
                          *heiden@mclu.org*

                          *Attorneys for Plaintiff*