# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|                          |     |                              |
|--------------------------|-----|------------------------------|
| ELLEN H. DECOTIIS,       | )   |                              |
|                          | )   |                              |
| Plaintiff,               | )   |                              |
|                          | )   |                              |
| v.                       | )   | Docket No. 09-cv-354-P-S     |
|                          | )   |                              |
| LORI WHITTEMORE, et al., | )   |                              |
|                          | )   |                              |
| Defendants.              | )   |                              |
|                          | )   |                              |

## ORDER ON MOTION TO DISMISS

Before the Court is the Motion to Dismiss by Defendants Lori Whittemore, Child Development Services-Cumberland, and Debra Hannigan.  As explained herein, the Court GRANTS the motion and DISMISSES Plaintiff's Complaint.

## I.    LEGAL STANDARD

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the "legal sufficiency" of a complaint.  Gomes v. Univ. of Me. Sys., 304 F. Supp. 2d 117, 120 (D. Me. 2004).  The general rules of pleading require "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This short and plain statement need only "give the defendant fair notice of what the claim is and the grounds upon which it rests."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation and alteration omitted).  However, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (internal quotation omitted).

The Court must accept as true all well-pleaded factual allegations in the Complaint and draw all reasonable inferences in Plaintiff's favor.  <u>Gargano v. Liberty Int'l Underwriters, Inc.</u>, 572 F.3d 45, 48 (1st Cir. 2009).  In distinguishing sufficient from insufficient pleadings, which is "a context-specific task," the Court must "draw on its judicial experience and common sense." <u>Iqbal</u>, 129 S. Ct. at 1950.

## II.  FACTUAL BACKGROUND

Defendant Debra Hannigan is the State Director of the Child Development Services of Maine ("CDS").  The CDS system is comprised of fifteen regional CDS sites around the State of Maine.  Defendant CDS-Cumberland is one of the regional sites.  Defendant Lori Wittemore is Director of CDS-Cumberland.

CDS services are generally provided by contract with individual providers.  Plaintiff Ellen Decotiis is a speech-language pathologist and speech-language therapist who provided speech and language therapy and evaluations under contracts with various regional sites for eighteen years.  In 2008, Plaintiff was under contract with CDS-Cumberland, CDS-York, and CDS-Norway to provide speech and language therapy and evaluations for children with disabilities between the ages of three and five.

Among the services provided by CDS is Free Appropriate Public Education ("FAPE"), a program supervised by the Maine Department of Education in which children with disabilities between the ages of three and five years old are provided with therapy for physical, cognitive, communication, social, emotional, and adaptive development.  In 2008, the Maine legislature passed Unified Rule 101, which changed the way FAPE services were administered for children between the ages of three and five.  Prior to Unified Rule 101, services were provided on a year-round basis.  Unified Rule 101 provided that services would be offered on a school-year basis

(September 1-June 30), and that a child would be entitled to services in July and August only if they qualified for Extended School Year Services ("ESY").[1]   The State CDS adopted a policy that ESY services would be the exception and not the rule, and that ESY services would be provided only if the team consulting on a child's IEP determined, on an individualized basis, that the services were necessary to comply with federal law.

Following the adoption of Unified Rule 101, there was "confusion and concern" among the regional CDS sites, providers of services, and parents of children with disabilities. (Complaint, Court Doc. 1, ¶ 23.)  In early 2008, CDS-York and CDS-Norway informed Plaintiff of the procedure by which requests for ESY services would be evaluated in their regions.  CDS-Cumberland gave Plaintiff no such guidance.

In March 2008, Plaintiff completed her routine quarterly reports for her caseload of children covered by CDS-Cumberland.  These reports included her recommendations for ESY services.  Based on her experience with CDS-York and CDS-Norway, Plaintiff expected that CDS-Cumberland would then notify her of an IEP meeting for each client, during which she expected that a decision would be made with regard to that client's eligibility for ESY services. CDS-Cumberland did not contact Plaintiff to schedule IEP review meetings regarding ESY services.

Plaintiff became concerned that CDS-Cumberland was acting unlawfully by not complying with federal standards regarding the provision of ESY services.  Plaintiff contacted Defendant Hannigan regarding the difference between how eligibility for ESY services was being handled by CDS-York and CDS-Norway on the one hand, and CDS-Cumberland on the other.  Hannigan informed Plaintiff that she could not account for the inconsistency.  Plaintiff

---

[1] The Court notes that Plaintiff refers to the Extended School Year Services as "EYS" while Defendants refer to these services as "ESY".  The Court will refer to Extended School Year Services as "ESY".

then contacted Southern Maine Parents Awareness ("SMPA"), a private advocacy group giving support to parents with children with disabilities, and the Disability Rights Center ("DRC"), a federally funded, statewide advocacy group for people with disabilities.  Plaintiff was informed by these organizations that CDS-Cumberland did not appear to be complying with state and federal laws in how it was determining eligibility for ESY services.

After receiving feedback from the advocacy groups, Plaintiff informed the parents of her CDS-Cumberland clients that she was "confused and concerned" about the criteria CDS-Cumberland was using for determining eligibility for ESY services.  (Complaint ¶ 42.)  She urged those parents to contact SMPA and DRC for guidance with regard to their rights under state and federal laws.  Plaintiff also posted the name and telephone number of the SMPA and DRC in her office for the benefit of her clients' parents.

In May 2008, Defendant Whittemore contacted Plaintiff to complain that Plaintiff was "out to get her."  (Complaint ¶ 43.)  On July 29, 2008, Plaintiff was informed by CDS-Cumberland that it would not renew her annual contract, which was set to expire on September 1, 2008.

## III.    DISCUSSION

Plaintiff brings a claim for retaliation in violation of her First Amendment rights against Defendant Whittemore individually and in her official capacity as director of CDS-Cumberland. Plaintiff also brings a claim against CDS-Cumberland for an unconstitutional policy, custom or procedure and for failure to train Whittemore.  Plaintiff's final claim is against Defendant Hannigan in her official capacity as Director of CDS and alleges that Hannigan failed to adequately supervise Whittemore.  Plaintiff seeks a declaration that the non-renewal of her contract violated her First Amendment rights, compensatory and punitive damages, the

reinstatement of her contract with CDS-Cumberland, injunctive relief to prevent further retaliation based on protected speech, and attorney's fees.  Each of Plaintiff's claims will be addressed in turn below.

### A.      Plaintiff's Claims against Defendant Whittemore (Count I)

Plaintiff brings a First Amendment retaliation claim against Defendant Whittemore in her individual capacity and in her official capacity as director of CDS-Cumberland.  Initially, the Court notes that Plaintiff's claim against Whittemore in her official capacity is redundant because Plaintiff has also named CDS-Cumberland as a Defendant.  See Surprenant v. Rivas, 424 F.3d 5, 19 (1st Cir. 2005) ("A suit against a public official in his official capacity is a suit against the governmental entity itself.").  Accordingly, Plaintiff's claim against Defendant Whittemore in her official capacity is dismissed.

As to Plaintiff's claims against Defendant Whittemore in her individual capacity, Defendant Whittemore has asserted the defense of qualified immunity.  "Qualified immunity is a judge-made construct that broadly protects public officials from the threat of litigation arising out of their performance of discretionary functions."  Bergeron v. Cabral, 560 F.3d 1, 5 (1st Cir. 2009).  The qualified immunity analysis generally follows a two-step approach which asks:  "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).

### 1.      Does Plaintiff's Compliant sufficiently allege a constitutional violation?

"Public employees do not lose their First Amendment rights to speak on matters of public concern simply because they are public employees."[2]  Curran v. Cousins, 509 F.3d 36, 44 (1st

---

[2] The Court notes that Plaintiff is not technically a government employee as she works under contract with CDS-Cumberland.  However, government contractors have long been protected under the First Amendment from

Cir. 2007) (citing Connick v. Myers, 461 U.S. 138, 142 (1983)).  These rights, however, are not absolute.  "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."  Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).  To prevail on a First Amendment retaliation claim, a plaintiff must show:  (1) that she spoke as a citizen on a matter of public concern; (2) that her interest in commenting upon these matters outweighed the defendant's interest in the efficient performance of its public services; and (3) that the protected speech was a substantial or motivating factor in the defendant's adverse employment action.  Lewis v. City of Boston, 321 F.3d 207, 218-19 (1st Cir. 2003).  The first two factors are questions of law for the Court while the third factor raises issues of fact, the resolution of which is ordinarily left for the jury. See Nethersole v. Bulger, 287 F.3d 15, 18-19 (1st Cir. 2002).

The first step of the test involves determining whether the Plaintiff engaged in protected speech.  In Garcetti, the Supreme Court recognized that this step actually involves two sub-parts: (1) whether the employee spoke as a citizen, and (2) whether the speech was on a matter of public concern.  547 U.S. at 419.  For purposes of the instant motion, the Court assumes that Plaintiff's speech was on a matter of public concern.  Plaintiff cannot, however, fulfill the first prong—that she was speaking "as a citizen" as opposed to pursuant to her official duties as an employee of CDS-Cumberland.

"A public employee who is speaking as an employee, rather than as a citizen, has no First Amendment cause of action based on his 'employer's reaction to the speech.'"  Bolduc v. Town of Webster, 629 F. Supp. 2d 132, 146 (D. Mass. 2009) (quoting Garcetti, 547 U.S. at 418).  In determining whether a speaker was acting as an employee or as a private citizen, the Court must

---

retaliatory government action to the same extent as government employees.  See Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 678-79 (1996).  Thus, the Court uses the terms contractor and employee interchangeably.

focus on the role the speaker occupied when the speech occurred rather than looking solely at the content of the speech.  See Mills v. City of Evansville, 452 F.3d 646, 647 (7th Cir. 2006); Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689, 692 (5th Cir. 2007).  "Even if the speech is of great social importance, it is not protected by the First Amendment so long as it was made pursuant to the worker's official duties."  Williams, 480 F.3d at 692.

While Garcetti clearly held that speech which arose out of an employee's official duties was not protected by the First Amendment, it left open the issue of how to determine whether speech arose out of an employee's official duties.  547 U.S. at 424.  In dicta, the Supreme Court noted that the inquiry into whether a public employee spoke as a citizen or pursuant to her official job duties should be a practical one.  Garcetti, 547 U.S. at 424.  "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes."  Id. at 424-25.

Since Garcetti, the lower courts have looked to a number of different factors in determining whether speech is made pursuant to a public employee's official duties:  the plaintiff's job description, the persons to whom the speech was directed, the subject of the speech and its relation to the employee's official duties, whether the speech occurs at the workplace, and whether the speech resulted from special knowledge gained through the plaintiff's employment.  See Kelly v. Huntington Union Free Sch. Dist., No. 09-CV-2101, __ F. Supp. 2d __, 2009 WL 4981182, *7 (E.D.N.Y. Dec. 23, 2009) (collecting post-Garcetti cases).  Ultimately, the Court must determine whether the speech "owes its existence to a public employee's professional responsibilities."  Garcetti, 547 U.S. at 421.

As set forth below, taking all the facts pled in Plaintiff's Complaint as true, and drawing all reasonable inferences in her favor, the Court concludes that the speech at issue here was made in her capacity as a speech and language therapist for CDS-Cumberland, and not as a private citizen.   Consequently, Plaintiff's speech does not fall within the ambit of First Amendment protection.

First, the speech at issue here occurred while Plaintiff was acting as a therapist for CDS-Cumberland.   See Khan v. Fernandez-Rundle, 287 F. App'x 50, 53 (11th Cir. 2007) (holding that an employee's speech is not protected when that employee is acting as an agent of the government).   Plaintiff posted information for advocacy groups "in her office for the benefit of [her client's] parents."   (Complaint ¶ 41.)   Nothing in the Complaint or the parties' briefing on the instant motion suggests that Plaintiff met with or spoke to any of her clients' parents outside of their therapy sessions and/or evaluations.     It can be presumed, therefore, that the speech at issue here occurred during therapy sessions and/or evaluations conducted by the Plaintiff on behalf of CDS-Cumberland.

Thus, Plaintiff's speech was clearly directed at individuals she would not have encountered but for her contractual relationship with CDS-Cumberland.   Plaintiff's Complaint alleges that she provided information about the advocacy groups only to her clients' parents and urged only those individuals to contact these groups to explore their rights.   There is no allegation that Plaintiff attempted to spread her message to the public in general or even to reach out to parents of children with disabilities other than those that she treated under contract with CDS-Cumberland.[3]   That the target of Plaintiff's speech was her clients' parents, with whom she

---

[3] The Court notes that Plaintiff's Complaint contains an allegation that she reached out to SMPA and DRC for their opinion on whether CDS-Cumberland was complying with state and federal law before she urged her clients' parents to contact the groups.   However, Plaintiff's Complaint does not allege that this speech was a basis for the non-renewal of her contract.   Plaintiff's Complaint states:   "The true reason for CDS-Cumberland's non-renewal of

was meeting solely to provide therapy on behalf of CDS-Cumberland, weighs significantly in favor of finding that the speech was made pursuant to her official duties. See Modica v. Humphrey, 2007 WL 2777779, *4 (W.D. Tex. Sept. 21, 2007) ("where a public employee targets their speech has much to do with determining whether the speech was a 'statement[] pursuant to their official duties.'") (quoting Garcetti, 547 U.S. at 421).

Second, it is undisputed that the subject of Plaintiff's speech related to her employment with CDS-Cumberland. Plaintiff advised her clients' parents that she was "confused and concerned" about whether CDS-Cumberland was complying with state and federal law in how it was determining eligibility for ESY services—the very same services she was under contract to provide. Plaintiff was essentially concerned that her clients were not being offered all of the therapy to which they were entitled. As CDS-Cumberland's speech and language therapist, if her clients were found to be eligible for ESY services, Plaintiff would have been the provider of these services. That the subject of Plaintiff's speech directly related to her employment duties with CDS-Cumberland weighs in favor of finding that her speech is not protected. See Abdur-Rahman v. Walker, 567 F.3d 1278, 1282 (11th Cir. 2009) (noting that the subject of speech is a relevant but not determinative factor).

Third, Plaintiff's speech reflected special knowledge gained through her position as a speech and language therapist for CDS-Cumberland. Plaintiff alleges that, before she spoke with her clients' parents, she asked Hannigan about the inconsistency between CDS-Cumberland's standards for ESY services and other CDS regions. This inquiry was clearly made in her capacity as a CDS-Cumberland therapist. Plaintiff's dissatisfaction with Hannigan's response

---

Plaintiff's contract in 2008 was in response to advice that Plaintiff gave to parents of children she was providing services to that they should consult with the advocacy groups concerning positions that CDS-Cumberland was taking on the eligibility of EYS [sic] services to their children." (Complaint ¶ 47.) Because the Complaint does not allege that Plaintiff was retaliated against for contacting the advocacy organizations directly, the Court does not consider this speech in its analysis.

led her to urge her clients' parents to contact the advocacy organizations.  (Complaint ¶ 39.)

Thus, Plaintiff's speech was influenced and informed by her position as a therapist with CDS-

Cumberland, and this factor also weighs in favor of finding that Plaintiff's speech was not

protected.  See Williams, 480 F.3d at 694 (where plaintiff's speech was informed by "special

knowledge" gained as a result of his position, the speech was not protected by the First

Amendment).

        The Court acknowledges that none of these factors standing alone is determinative of

whether Plaintiff was speaking in accordance with her official duties.  As one court has held

"there is no simple checklist or formula by which to determine whether the employee was

speaking as a private citizen or as a public employee."  Caracillo v. Village of Seneca Falls, 582

F. Supp. 2d 390, 410 (W.D.N.Y. 2008).   However, these principles guide the Court in its attempt

to "distinguish between speech that is the kind of activity engaged in by citizens who do not

work for the government and activities undertaken in the course of performing one's job."

Davis, 518 F.3d at 312-13.  Considering the facts of this case, the Court concludes Plaintiff's

speech was precisely the type that "owes its existence to a public employee's professional

responsibilities" and, as such, it is not protected by the First Amendment.  See Callahan, 526

F.3d at 1044.

        The instant case is similar to Green v. Board of County Commissioners, 472 F.3d 794

(10th Cir. 2007).  Green, a drug-lab technician, became concerned that her agency lacked an

adequate confirmation testing policy, and that false positive test results were too common. After

her concerns were not addressed by her supervisor, she arranged for an outside company to

conduct a confirmation test, which showed a false positive.  When she suffered an adverse

employment action, plaintiff alleged retaliation.  The Tenth Circuit held that the plaintiff was not

acting as a citizen when she criticized her employer's policy on confirmation testing or when she arranged for the outside company to perform the confirmation test. The court noted that these activities were not part of her official duties, but they "stemmed from and were the type of activities that she was paid to do." Id. at 801. "Her disagreement with her supervisors' evaluation of the need for a formal testing policy, and her unauthorized obtaining of the confirmation test to prove her point, inescapably invoke Garcetti's admonishment that government employee's First Amendment rights do 'not invest them with a right to perform their jobs however they see fit.'" Id. (quoting Garcetti, 547 U.S. at 422).

Similarly, the Court acknowledges that it was not Plaintiff's official duty to comment on CDS-Cumberland's policy decisions with respect to ESY services. Nor was it likely an official duty to urge her clients' parents to contact advocacy organizations. Providing therapy, however, was an official duty and the disputed speech revolved around whether her clients were receiving the therapy to which she felt they were entitled. She was also tasked with completing evaluations and participating in the IEP process. Consulting with parents about the amount of services available to their children clearly stems from the work that she was paid by CDS-Cumberland to perform. The First Amendment does not afford Plaintiff the right to openly criticize her employer to the very clients whom she evaluates and treats at her employer's request. See Garcetti, 547 U.S. at 422 (employers have the right to ensure that their employees promote the employer's mission).

Plaintiff argues that her speech is protected under the rule of Pickering v. Board of Education, 391 U.S. 563, 572 (1968). Pickering involved a teacher speaking out publicly about the school board's allocation of funds. The Supreme Court held that her speech was protected even though the teacher's speech involved the subject of her employment. In this case, had

Plaintiff chosen to publicly air her concerns with respect to how CDS-Cumberland was determining ESY eligibility, her speech would likely have been protected under the <u>Pickering</u> rule. This is true even though her speech would have been informed by her experience as a therapist for CDS-Cumberland and related to the subject of her employment.

Situations such as those in <u>Pickering</u> are why, in <u>Garcetti</u>, the Supreme Court explicitly held that neither the fact that the speech occurred while the plaintiff was at work nor the fact that the subject of the speech was related to an employee's official duties was determinative of whether the speaker was acting as an employee or as a private citizen. In this case, however, Plaintiff did not express her concerns in a public forum or reach out to an audience unrelated to her employment with CDS-Cumberland. Instead, she chose to air her concerns in closed sessions to only those individuals that she treated as a result of her contract with CDS-Cumberland. This distinction is significant in light of <u>Pickering</u> and <u>Garcetti</u> and leaves Plaintiff's speech unprotected.

Plaintiff goes on to argue that her speech is protected because it was not part of her official duties to set criteria for the evaluations she conducted. She also claims that it was not her job to tell CDS-Cumberland that it was not complying with the law. But Plaintiff's argument urges the Court to adopt far too narrow a view of whether speech arose out of her official duties. Ultimately, the Court is to take a pragmatic approach to determining whether speech was part of an employee's official duties. <u>See</u> <u>Brammer-Hoelter v. Twin Peaks Charter Acad.</u>, 492 F.3d 1192, 1204 (10th Cir. 2007) (the Court must "take a practical view of all the facts and circumstances surrounding the speech and the employment relationship.") (<u>citing</u> <u>Garcetti</u>, 547 U.S. at 424-25). Practically speaking, Plaintiff did not morph from an employee of CDS-Cumberland to a private citizen immediately before she urged her clients' parents to contact

advocacy organizations about whether CDS-Cumberland was in compliance with federal law. When the speech at issue occurred, she was acting as a speech and language therapist for CDS-Cumberland rather than as a private citizen.   Thus, Defendants' non-renewal of Plaintiff's contract was a valid exercise of their authority to ensure that their employees accurately promote the goals of the agency and did not violate her First Amendment rights.  See Garcetti, 547 U.S. at 422-23 ("[s]upervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission.")  Accordingly, Plaintiff has failed to state a claim for retaliation in violation of her First Amendment rights.

2.    Was the constitutional violation clearly established?

Because the Court has held that Plaintiff's Complaint fails to state a First Amendment violation, Plaintiff has failed to satisfy the first prong of the qualified immunity analysis. However, in the interest of completeness, the Court will also address the second prong of the qualified immunity analysis—whether, assuming that a constitutional violation occurred, such right was clearly established.

"The 'clearly established' step is itself composed of two parts, which require the court to decide (1) whether the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that right, and (2) whether in the specific context of the case, a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights."   Mosher v. Nelson, 589 F.3d 488, 493 (1st Cir. 2009) (internal quotation omitted). The first prong "addresses the status of the law at the time of the event in question, focusing on the clarity of the standard with respect to the asserted constitutional right." Id.  The second prong "addresses the specific factual context of the case to determine whether a

reasonable official in the defendant's place would have understood that his conduct violated the asserted constitutional right." Id.

      a.      *Status of the law when Plaintiff's contract was not renewed*

Plaintiff was notified that CDS-Cumberland would not be renewing her contract by letter dated July 29, 2008.  (Complaint ¶ 44.)  By the time Plaintiff was notified of the non-renewal of her contract, Garcetti had been the law of the land for over two years.  Thus, the general proposition that speech arose out of an employee's official duties was not protected by the First Amendment was clearly established at the relevant time.  "But the inquiry into whether a right is clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition."  Whalen v. Mass. Trial Court, 397 F.3d 19, 27 (1st Cir. 2005).  In Garcetti, the plaintiff admitted that his speech was undertaken in performance of an official duty of his position.  The only question before the Court was whether speech that undisputedly arose out of an employee's official duties was protected by the First Amendment.  Based on the plaintiff's admission that the speech arose out of his official duties as a prosecutor, the Supreme Court explicitly stated that it had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate."  Garcetti, 547 U.S. at 424.

In this case, there is no admission with regard to whether Plaintiff's speech arose out of her official duties.  In fact, as is obvious from the discussion above, the parties hotly contest the issue.  Thus, the Court is not concerned with whether speech that is undisputedly related to an employee's official duties is protected by the First Amendment.  Rather, the salient inquiry is the Plaintiff was acting as an employee or as a private citizen when the speech at issue occurred.

Multiple courts have acknowledged that <u>Garcetti</u> left to the lower courts the task of fleshing out the distinction between speech made in conjunction with one's official duties and that made in one's capacity as a private citizen.  <u>See</u> <u>Morales v. Jones</u>, 494 F.3d 590, 596 (7th Cir. 2007) (noting that lower courts have been left to apply <u>Garcetti</u> "in an attempt to define the scope of an employee's duties."); <u>Davis v. McKinney</u>, 518 F.3d 304, 312 (5th Cir. 2008) (surveying case law and noting that "all implications of <u>Garcetti</u> have not been developed at this point.").  As one court observed, "[w]hether the water has been somewhat cleared or further muddied by <u>Garcetti</u> remains to be seen.  Suffice it to say, many billable hours will likely be spent wrangling over the scope of every employee-plaintiff's 'official duties.'"  <u>Price v. Macleish</u>, No. 04-956(GMS), 2006 WL 2346430, *5 (D. Del. Aug. 14, 2006). Although the First Circuit has decided a number of First Amendment retaliation cases since <u>Garcetti</u>, none of these cases has focused on whether the speaker was acting as an employee or as a private citizen when the relevant speech occurred.  Thus, at the time Plaintiff's contract with CDS-Cumberland was not renewed, there was little guidance on how an individual was to determine whether speech arose out of an employee's official duties or was made as a private citizen.

> b.    *Whether a reasonable person would have been aware of the right*

Accepting Plaintiff's factual allegations as true for the purposes of the instant motion, Whittemore knew that Plaintiff had urged the parents of Plaintiff's clients to contact disability advocacy organizations about whether CDS-Cumberland was complying with the law regarding provision of ESY services.  Whittemore also knew that Plaintiff had posted the contact information for these advocacy organizations in her office to assist her clients' parents.  Based on these actions, Whittemore decided not to renew Plaintiff's contract with CDS-Cumberland.

For purposes of qualified immunity, the Court must decide whether a reasonable official in Whittemore's position would have understood that the non-renewal of Plaintiff's contract with CDS-Cumberland violated Plaintiff's First Amendment rights. See Mosher, 589 F.3d at 495. Specifically, the Court must determine whether a reasonable official in Whittemore's position would have understood that Plaintiff's speech was made in her capacity as a private citizen and, therefore, making an adverse employment decision based upon this speech was a violation of the First Amendment.

"When determining whether a reasonable officer would have been aware of a constitutional right, we do not impose on the official a duty to sort out conflicting decisions or to resolve subtle or open issues." McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998). "In order to show that a principle is clearly established . . . a plaintiff ordinarily must identify cases of controlling authority at the time of the incident or a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." Bergeron v. Cabral, 560 F.3d 1, 11 (1st Cir. 2009) (internal quotations omitted).

The Supreme Court explicitly left open the issue of how to define the scope of an employee's official duties. As noted above, the First Circuit has yet to fill that void. Thus, there is no binding precedent on what constitutes citizen speech as opposed to speech which arises out of an employee's official duties. Moreover, Plaintiff has failed to cite a single case from another jurisdiction, much less a consensus of cases, with sufficiently similar facts to have put Whittemore on notice that Plaintiff's speech could be construed as citizen speech.[4]

---

[4] Plaintiff argues that Whittemore was on notice that termination on the basis of Plaintiff's speech violated the First Amendment because CDS-Cumberland had tried to terminate her employment in 1997 after she testified before the Maine State Legislature on disability rights. Initially, the Court notes that Plaintiff's Complaint fails to allege that Defendant Whittemore was involved in or aware of the 1997 events. Defendant Whittemore has asserted the defense of qualified immunity in opposition to Plaintiff's claim against her in her individual capacity. As such, it is immaterial what may have transpired between Plaintiff and CDS-Cumberland in 1997. Additionally, the relevant inquiry is whether the law was clearly established with respect to the First Amendment protection afforded to

Given the lack of clarity regarding the distinction between citizen speech and official duty speech, both in the First Circuit and beyond, a reasonable official in Whittemore's position could have believed that Plaintiff's speech arose out of her official duties and was not, therefore, protected by the First Amendment.  Accordingly, even if Plaintiff's Complaint stated a claim for First Amendment retaliation, Defendant Whittemore is entitled to qualified immunity because it was not clearly established that the First Amendment would be violated by the non-renewal of Plaintiff's contract in these circumstances.

### B.    Plaintiff's Claim Against Defendant CDS-Cumberland (Count II)[5]

Plaintiff brings a claim against CDS-Cumberland for violation of her First Amendment rights alleging that CDS-Cumberland:  (1) had an unconstitutional practice, custom or policy of First Amendment retaliation; and (2) failed to adequately train Whittemore on an employee's First Amendment rights.  The First Circuit has held that an employer cannot be held liable in a § 1983 action absent a constitutional violation by its employees.  Evans v. Avery, 100 F.3d 1033, 1040 (1st Cir. 1996); see also DiRico v. City of Quincy, 404 F.3d 464, 469 (1st Cir. 2005) (plaintiff's claim against the city was properly dismissed where a jury determined that the city's officers did not violate the plaintiff's constitutional rights).  Because the Court concluded that Plaintiff has failed to adequately allege a First Amendment violation by Whittemore, Plaintiff's Complaint against CDS-Cumberland must be dismissed.

---

Plaintiff's speech.  Plaintiff alleges that the Maine Civil Liberties Union sent a letter on her behalf in 1997 threatening litigation, but does not appear that any legal action was ever instituted.  As such, the Court does not see how the 1997 events could have resulted in any precedent that would have put a reasonable official in Whittemore's position on notice that her actions may have violated Plaintiff's First Amendment rights.  Finally, the Court notes that the law has changed significantly since 1997, and what may have been clearly established law then could be entirely different today.  Overall, the Court finds that Plaintiff's inclusion of the 1997 events in the instant action is a red herring that has no impact on the outcome of the instant motion.

[5] Defendant CDS-Cumberland also moved to dismiss based on Eleventh Amendment immunity.  Although the Court believes that dismissal on such grounds was likely appropriate, it is not necessary to address that issue given the Court's ruling on the merits of Plaintiff's Complaint.

### C.      Plaintiff's Claim Against Defendant Hannigan (Count III)[6]

Plaintiff brings a claim against Defendant Hannigan alleging that Hannigan failed to adequately supervise Whittemore.   In a § 1983 action, a supervisor can be held liable if:  (1) the behavior of her subordinates results in a constitutional violation, and (2) the supervisor's action or inaction was affirmatively linked to that behavior so that it could be characterized as "supervisory encouragement, condonation, or acquiescence" or "gross negligence amounting to deliberate indifference."  <u>Lipsett v. University of Puerto Rico</u>, 864 F.2d 881, 902 (1st Cir. 1988). As discussed above, Plaintiff has failed to allege facts sufficient to state a claim for First Amendment retaliation against Defendant Whittemore.   Because the Court concluded that Plaintiff has failed to show that Defendant Hannigan's subordinates violated her constitutional rights, Plaintiff's claim against Defendant Hannigan must also be dismissed.

## IV.      CONCLUSION

For the reasons explained herein, the Court ORDERS that Defendants' Motion to Dismiss (Docket # 9) is GRANTED.  Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 28th day of January, 2010.

---

[6] Defendant Hannigan also moved to dismiss based on Eleventh Amendment immunity.  Although the Court believes that dismissal on such grounds was likely appropriate, it is not necessary to address that issue given the Court's ruling on the merits of Plaintiff's Complaint.