## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| ELLEN H. DECOTIIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket no. 2:09-cv-354-GZS |
| | ) | |
| LORI WHITTEMORE, et al., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER ON PENDING MOTIONS

Following a remand from the First Circuit, Plaintiff Ellen DeCotiis ("DeCotiis") has filed the following motions: (1) Motion for Leave to Amend Complaint ("First Motion to Amend") (Docket # 33); (2) Motion to Amend or Modify Order and Second Motion to Amend and Add a Party ("Motion to Modify Order and Second Motion to Amend") (Docket # 38); and (3) Motion to Strike (Docket # 43).  Defendants not only object to Plaintiff's motions but have filed the Motion to Dismiss the Complaint ("Motion to Dismiss") (Docket # 37).  As explained herein, the Court now DENIES Plaintiff's Motion to Strike (Docket # 43).  The Court then GRANTS IN PART and DENIES IN PART Plaintiff's First Motion to Amend (Docket # 33), Plaintiff's Motion to Modify Order and Second Motion to Amend (Docket # 38), and Defendant's Motion to Dismiss (Docket # 37).

### I.        MOTION TO STRIKE (Docket # 43)

Via the Motion to Strike, Plaintiff alleges that Defendants engaged in a "blatant discovery violation" when (1) a defense witness provided testimony based on a document that had not been produced in discovery and (2) Defendants withheld the documents during briefing of the

Eleventh Amendment issues.  As a result, Plaintiff asks the Court to exclude from its consideration evidence that supports a finding that CDS-Cumberland is covered by the State's Risk Management Program.  For reasons adequately stated in Defendant's Response (Docket # 45), the Court rules that there was no discovery violation.  To the extent any impropriety occurred, Plaintiff was not prejudiced by the delayed production of the relevant documents. Accordingly, Plaintiff's Motion to Strike is DENIED.[1]


## II.     THE REMAINING MOTIONS

### A.     BACKGROUND & PROCEDURAL HISTORY

Both this Court and the First Circuit previously have detailed the factual background in this case.  See Decotiis v. Whittemore, 635 F.3d 22 (1st Cir. 2011); Decotiis v. Whittemore, 680 F. Supp. 2d 263 (D. Me. 2010).  Accordingly, the Court briefly summarizes the relevant facts. Plaintiff Ellen DeCotiis is a licensed speech-language pathologist and speech-language therapist who for more than eighteen years has provided speech and language therapy and evaluations at various State of Maine Child Development Services ("CDS") regional sites.  In 2008, Plaintiff worked under contracts with CDS-York, CDS-Norway, and Defendant CDS-Cumberland to provide speech and language therapy and evaluations for children with disabilities between the ages of three and five.

Among the services CDS sites provide to children is Free Appropriate Public Education ("FAPE"), a program supervised by the Maine Department of Education in which children with disabilities between the ages of three and five years are provided with therapy for physical,

---

[1] The Court notes that its ruling on the Motion to Strike ultimately has no impact on the decisions reached on the other pending motions.  In particular, the Court would have reached the same result regarding the Motion to Dismiss even if it had granted the Motion to Strike.

cognitive, communication, social, emotional, and adaptive development.  In 2008, the Maine legislature passed Unified Rule 101, which changed the way FAPE services were provided on a year-round basis.  Unified Rule 101 provided that services would be offered on a school-year basis (September-June), and that children would be entitled to services in July and August only if they qualified for Extended School Year Services ("ESY").  Whereas the prior version of the rule provided children with year-round services if stated in their Individualized Family Service Plan ("IFSP") or Individualized Education Plan ("IEP"), which was generally based on the calendar year, the State CDS adopted a policy under the new rule whereby ESY would be the exception and not the rule.  Under the new policy, ESY services would be provided only if the team consulting on a child's IEP determined, on an individualized basis, that the services were necessary to comply with federal law.

The adoption of Unified Rule 101 caused "confusion and concern" among regional CDS sites, providers of services, and parents of children with disabilities.  (Amended Complaint (Docket # 38-1) ¶ 22.)  In early 2008, CDS-York and CDS-Norway informed Plaintiff of the procedure by which requests for ESY services would be evaluated in their regions.  CDS-Cumberland, however, gave Plaintiff no such guidance.  In March 2008, Plaintiff completed her routine quarterly reports for her caseload of children covered by CDS-Cumberland.  These reports included recommendations for ESY services.  Based on her experience with CDS-York and CDS-Norway, Plaintiff expected that CDS-Cumberland would then notify her of an IEP meeting for each client, during which she expected that a decision would be made regarding that child's eligibility for ESY services.  However, CDS-Cumberland did not contact Plaintiff to schedule IEP review meetings regarding ESY services.

3

In the Spring of 2008, Plaintiff became concerned that CDS-Cumberland was acting unlawfully by failing to comply with federal standards regarding the provision of ESY services. Plaintiff contacted Defendant Hannigan, State CDS Director and Director of CDS-Cumberland, regarding inconsistencies between the provision of ESY services at CDS-Cumberland and other regional CDS sites.   Hannigan informed Plaintiff that she could not account for the inconsistencies.  In response, Plaintiff contacted Southern Maine Parents Awareness ("SMPA"), a private advocacy group giving support to parents with children with disabilities; the Disability Rights Center ("DRC"), a federally funded, statewide advocacy group for people with disabilities; and individuals in the Maine Speech Language Hearing Association.  SMPA and DRC informed Plaintiff that CDS-Cumberland did not appear to be complying with state and federal requirements under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1401, et seq. ("IDEA").  Plaintiff concluded that CDS-Cumberland was not operating in compliance with IDEA and was denying children of public services to which they were entitled.

Acting on her investigations and conclusions, Plaintiff advocated to parents of children she was treating that the criteria being used by CDS-Cumberland for determining eligibility for ESY services were not in compliance with IDEA and that parents should contact SMPA and DRC for guidance concerning their children's rights.   In May 2008, Whittemore contacted Plaintiff to complain that Plaintiff was "out to get her" with the advice she was giving parents about contacting advocacy groups.  (Amended Complaint ¶ 42.)  On July 29, 2008, Plaintiff was informed that CDS-Cumberland had decided that it would not renew her annual contract, which was set to expire on September 1, 2008.

On August 7, 2009, Plaintiff filed her Complaint (the "Original Complaint") (Docket # 1), which contained three counts:  Count One, for retaliation in violation of her First Amendment

rights against Defendant Whittemore individually and in her official capacity as director of CDS-Cumberland; Count Two, against CDS-Cumberland for an unconstitutional policy, custom, or procedure and for failure to train Whittemore; and Count Three, against Defendant Hannigan in her official capacity as Director of CDS for failure to adequately supervise Whittemore. In an Order dated January 28, 2010, this Court dismissed Plaintiff's Complaint in its entirety. (See Judgment (Docket #17); Decotiis, 680 F. Supp. 2d at 265). The Court dismissed Count One against Whittemore in her official capacity because it was redundant of the claim against CDS-Cumberland and against Whittemore in her individual capacity on qualified immunity grounds. The Court dismissed Count Two against CDS-Cumberland after concluding that Plaintiff had failed to adequately allege a violation of her First Amendment rights. Finally, the Court dismissed Count Three against Defendant Hannigan after concluding that Plaintiff failed to show that Hannigan's subordinates violated Plaintiff's First Amendment rights.

Following Plaintiff's appeal, the First Circuit upheld this Court's judgment dismissing the Complaint against Whittemore in both her individual and official capacity. See Decotiis, 635 F.3d at 26-27. However, after considering two First Circuit cases decided after the January 28, 2010 Order, the First Circuit vacated this Court's judgment dismissing the claims against Hannigan and CDS-Cumberland and remanded for further consideration. See id. Thus, on remand, Count Two and Count Three of Plaintiff's Original Complaint remain.

**B.   LEGAL STANDARD**

On remand, Plaintiff moves this Court for leave to amend her Complaint. Pursuant to Fed. R. Civ. P. 15(a)(2), the Court "should freely give leave [to amend] when justice so requires." In exercising its discretion to allow amendment of pleadings, a court may find that a motion to amend a complaint following an appeal and remand is still timely. See, e.g., 6 Charles

Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1488 & n.11 (3d ed. 2010) (collecting cases). Nonetheless, even a timely motion for leave to amend is properly denied when the proposed amendments would be futile. See Foman v. Davis, 371 U.S. 178, 182 (1962) (leave to amend should be granted where there is no "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility…."); Chiang v. Skeirik, 582 F.3d 238, 243-44 (1st Cir. 2009); Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 59 (1st Cir. 1990) ("Where an amendment would be futile or would serve no legitimate purpose, the district court should not needlessly prolong matters."), overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61 (1st Cir. 2004). If leave to amend is sought before discovery is complete and neither party has moved for summary judgment, "futility" is gauged by the criteria of Rule 12(b)(6). See Hatch v. Dept. for Children Youth and Their Families, 274 F.3d 12, 19 (1st Cir. 2001).

Defendant moves to dismiss the remanded portions of Plaintiff's Complaint and Plaintiff's Proposed Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Under Rule 12(b)(1), a party may move to dismiss due to lack of subject matter jurisdiction. See, e.g., Am. Fiber & Finishing, Inc. v. Tyco Healthcare Group, LP, 362 F.3d 136, 138 (1st Cir. 2004) ("Federal courts are courts of limited jurisdiction. In the absence of jurisdiction, a court is powerless to act."). Rule 12(b)(1) is the proper vehicle for addressing a variety of jurisdictional questions, including sovereign immunity. See Valentin v. Hospital Bella Vista, 254 F.3d 358, 362-63 (1st Cir. 2001) ("[Rule 12(b)(1)] is a large umbrella, overspreading a variety of different types of challenges to subject-matter jurisdiction," including "sovereign immunity"). The burden falls on the party invoking jurisdiction "clearly to allege facts

6

demonstrating that he is a proper party to invoke federal jurisdiction." Marcello v. Maine, 464 F. Supp. 2d 38, 41 (D. Me. 2006) (citing Dubois v. United States Dep't of Agric., 102 F.3d 1273, 1281 (1st Cir. 1996)).  Furthermore, the Court may consider extrinsic materials when considering a motion to dismiss under Rule 12(b)(1).  Id. (citing Aversa v. United States, 99 F.3d 1200, 1209-10 (1st Cir. 1996) ("In ruling on a motion to dismiss for lack of subject matter jurisdiction ... the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff....  In addition, the court may consider whatever evidence has been submitted....")).

     "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, — U.S. — , 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)).  In considering the merits of a motion to dismiss, the Court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in Plaintiff's favor.  Gargano v. Liberty Intern. Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009). The Court must examine the factual content of the complaint and determine whether those facts support a reasonable inference "that the defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1949.  While a complaint "need not include evidentiary detail, it must nonetheless allege a factual predicate concrete enough to warrant further proceedings." U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 240 (1st Cir. 2004), abrogated on other grounds by Allison Engine Co., Inc. v. U.S. ex rel. Sanders, 553 U.S. 662 (2008).  Moreover, the Court need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 129 S. Ct. at 1949.

## C. PLAINTIFF'S REQUESTS TO REINTRODUCE LORI WHITTEMORE AS A DEFENDANT

The Court first turns its attention to the Motion to Modify Order and Second Motion to Amend (Docket # 38) as well as a portion of Plaintiff's First Motion to Amend (Docket # 33). The Court focuses specifically on Plaintiff's request that the Court modify or amend its January 28, 2010 Order and thereby allow an Amended Complaint that would add Whittemore as a defendant in her individual capacity for money damages under Counts II and III and as a defendant in her official capacity on all Counts for the purpose of obtaining reinstatement under the Ex Parte Young doctrine.

The January 28, 2010 Order Plaintiff asks this Court to now "modify" dismissed all of Plaintiff's claims, including all claims against Whittemore. As a result, judgment was entered in favor of Whittemore by this Court. (See Judgment (Docket # 19).) Following Plaintiff's appeal to the First Circuit, the First Circuit entered a judgment on March 24, 2011 that decreed in relevant part that "[t]he judgment of the district court as to Defendant Lori Whittemore is affirmed." (See First Circuit Judgment (Docket # 24) at 3.) Given this procedural history, the Court believes that Plaintiff is barred from seeking to resurrect Whittemore as a defendant in this action.

The first bar to Plaintiff's reinsertion of Whittemore: the mandate rule of the law of the case doctrine. See United States v. Matthews, 643 F.3d 9, 13 (1st Cir. 2011) ("The law of the case doctrine has two branches. The first branch-known colloquially as the mandate rule— prevents relitigation in the trial court of matters that were explicitly or implicitly decided by an earlier appellate decision in the same case.") (internal quotations omitted). The law of the case doctrine "precludes relitigation of the legal issues presented in successive stages of a single case once those issues have been decided." See Morales-Vallellanes v. Potter, 605 F.3d 27, 34 (1st

Cir. 2010) (quoting <u>United States v. Vigneau</u>, 337 F.3d 62, 67 (1st Cir. 2003)); <u>see also</u> <u>United States v. Rivera-Martinez</u>, 931 F.3d 148, 150 (1st Cir. 1991) ("When a case is appealable and remanded, the decision of the appellate court establishes the law of the case and it must be followed by the trial court on remand."). The doctrine "contemplates that a legal decision made at one stage of a criminal or civil proceeding should remain the law of the case throughout the litigation, unless and until the decision is modified or overruled by a higher court." <u>Negron-Almeda v. Santiago</u>, 579 F.3d 45, 50 (1st Cir. 2009) (citing <u>United States v. Moran</u>, 393 F.3d 1, 7 (1st Cir. 2004)). The fact remains that the First Circuit affirmed the dismissal of Defendant Whittemore and, as a result, Defendant Whittemore is not before this Court on remand. Under these circumstances, the dismissal of Whittemore "fits within the law of the case doctrine." <u>Id.</u> at 51.[2]

Recognizing the hurdle presented by the mandate rule branch of the law of the case doctrine, Plaintiff invokes the "serious injustice exception" to the law of the case doctrine. <u>See</u> <u>Negron-Almeda</u>, 579 F.3d at 51-52 (explaining that "a showing of exceptional circumstances" can exist when "controlling legal authority has changed dramatically; significant new evidence, not earlier obtainable in the exercise of due diligence [, is proffered]; or . . . a blatant error in the prior decision will, if uncorrected, result in a serious injustice.").[3] To the extent that Plaintiff

---

[2] Moreover, but for the remand of claims against other Defendants, the First Circuit's March 24, 2011 Judgment would serve as res judicata as to any claims that Plaintiff could have been raised against Whittemore in the earlier iteration of this case. <u>See, e.g.</u>, <u>Merrimack Street Garage, Inc. v. General Motors Corp.</u>, 667 F. Supp. 41, 44 (D.N.H. 1987) ("Absent unusual circumstances, a judgment affirmed is final for res judicata purposes as to those parts of the action no longer subject to litigation.").

[3] <u>Negron-Almeda</u> is a unique and distinguishable case. In <u>Negron-Almeda</u>, the First Circuit considered three factors in deciding that the serious injustice exception was applicable. 579 F.3d at 52. First, in an earlier ruling in the same case, the Court of Appeals specifically directed the district court to consider whether the law of the case doctrine applied to plaintiffs' motion to vacate and/or amend. <u>Id.</u> The Court of Appeals noted that it would not have included such a directive if it had concluded that law of the case barred recovery. <u>See id.</u> Second, the district court acknowledged that its original decision to grant summary judgment in favor of the defendant state official in his official capacity was obviously wrong. Although the plaintiffs did not appeal the district court's ruling in favor of the state official, the district court repeatedly disavowed the clear language of its order and ordered reinstatement of

argues that the Court's January 28, 2010 Order contained a blatant error and that leaving the prior decision uncorrected will result in a serious injustice, the Court disagrees with Plaintiff's assessment.  Plaintiff could have made her Ex Parte Young argument earlier – either to this Court on the first motion to dismiss or to the Court of Appeals.  Plaintiff's failure to make this argument – not the Court's January 28, 2010 Order – is the reason Plaintiff is prevented from making an Ex Parte Young argument for reinstatement.  Furthermore, this Court's dismissal of Whittemore in her official capacity was not obviously wrong – it was predicated upon the basic rule that a "suit against a public official in his official capacity is a suit against the government entity itself."  See Surprenant v. Rivas, 424 F.3d 5, 19 (1st Cir. 2005) (citing Wood v. Hancock County Sheriff's Dept., 354 F.3d 57, 59 n.1 (1st Cir. 2003)); Burrell v. Hampshire Cnty., 307 F.3d 1, 7 (1st Cir. 2002).[4]

Ultimately, the First Circuit affirmed "the district court's judgment dismissing the complaint against Whittemore, because she is entitled to qualified immunity in her individual capacity and the suit against Whittemore in her official capacity is redundant of the suit against CDS-Cumberland."  (First Circuit Judgment at 3; Decotiis, 635 F.3d at 26).  In short, Plaintiff failed to challenge dismissal of Whittemore in her official capacity on the basis of Ex Parte Young and, therefore, waived the argument.  See Negron-Almeda, 528 F.3d at 24-25 (ruling that plaintiffs waived their Ex Parte Young argument because they did not brief the argument on appeal and only raised the argument during appellate oral argument); United States v. Houlihan, 92 F.3d 1271, 1292 (1st Cir. 1996) ("noting settled appellate rule that issues not briefed and

---

plaintiffs in several successive rulings. Third, the grant of summary judgment was highly prejudicial to the plaintiffs because it prevented them from obtaining the equitable relief – namely, reinstatement – they sought and to which the district court determined they were otherwise entitled.  Id.

[4] Because the Court, and for that matter the First Circuit, has determined that Defendant Whittemore is dismissed from this case in her official capacity, the Court does not determine whether the doctrine set forth in Ex Parte Young requires that Plaintiff be awarded the equitable relief of reinstatement.

properly developed on appeal are waived") (internal citation and quotation omitted); <u>Martinez v. Colon</u>, 54 F.3d 980, 987 (1st Cir. 1995) (stating that where plaintiff did not proffer an argument in the district court or in his appellate brief, the argument is waived).

In short, the Court finds that Plaintiff's attempts to reintroduce Whittemore on remand on barred by the mandate rule and waiver. Additionally, the Court considers attempts to state additional claims against Whittemore untimely. For all of these reasons, the Court DENIES Plaintiff's First Motion to Amend and Second Motion to Amend to the extent either motion sought an amendment regarding Whittemore as a defendant.[5]

## D.   PLAINTIFF'S OTHER PROPOSED AMENDMENTS

The remaining portions of Plaintiff's First and Second Motions to Amend seek to amend the Complaint in order to: (1) remove Defendant Hannigan; (2) clarify that Plaintiff's claims against Defendant CDS-Cumberland are predicated upon <u>Monell</u> liability, <u>see</u> <u>Monell v. New York City Dept. of Soc. Servs.</u>, 436 U.S. 658 (1978); and (3) add claims for retaliation against CDS-Cumberland under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the Americans with Disability Act ("ADA"), 42 U.S.C. §§ 12101, <u>et seq.</u> Defendant does not object to the removal of Hannigan and, thus, to the extent that the First and Second Motions to Amend seek that removal, the Motions are GRANTED IN PART WITHOUT OBJECTION.

Defendant does object to all of Plaintiff's other proposed amendments. Specifically, Defendant CDS-Cumberland contends that the Court lacks subject-matter jurisdiction over the

---

[5] The Court alternatively rules that Plaintiff's request to add Whittemore in her individual and official capacities to Counts II and III of the proposed Amended Complaint would be futile. <u>See</u> <u>Maine Human Rights Com'n v. Coffee Couple LLC</u>, No. 1:10–cv–00180, 2011 WL 2312572, at *7 (D. Me. June 08, 2011) (collecting cases holding that individual defendants cannot be held personally liable in damages for violations of the ADA); <u>see also</u> <u>Kiman v. N.H. Dep't of Corr.</u>, 451 F.3d 274, 290 (1st Cir. 2006) (noting that several courts have determined that Title II of the ADA does not provide for individual liability, although it did not need to reach the issue); <u>Spiegel v. Schulmann</u>, 604 F.3d 72, 79 (2d Cir. 2010) (no individual liability for retaliation under Title V of the ADA in the employment context); <u>Parenteau v. Prescott Unified Sch. Dist.</u>, No. 07-8072-PCTNVM, 2009 WL 536668, at *6 (D. Az. Mar. 4, 2009) ("There is no individual liability for damages under Title II of the ADA or § 504 of the Rehabilitation Act.").

First Amendment claims remanded to this Court.  Furthermore, Defendant argues that Plaintiff's requests for leave to amend her complaint to add ADA and Rehabilitation Act claims should be denied because they are futile.  In sum, Defendant seeks the complete dismissal of this case.  The Court considers each of these arguments in turn.

**1.  Deprivation of First Amendment Rights**

In relevant part, the First Circuit remanded this case for reconsideration of Count II of Plaintiff's Original Complaint, which stated a claim against CDS-Cumberland for depriving Plaintiff of her First Amendment rights.[6]  In her proposed Amended Complaint, Plaintiff re-labels her First Amendment claim as Count I.  Although Count I of the Amended Complaint is factually enhanced, the Court's legal analysis for Count I of the Amended Complaint against CDS-Cumberland and Count II of the original Complaint is identical, and results in the same conclusion.  Accordingly, the Court analyzes Count II of the original Complaint and Count I of the proposed Amended Complaint against CDS-Cumberland simultaneously.[7]

Defendant contends that the Court lacks subject-matter jurisdiction over Plaintiff's 42 U.S.C. § 1983 claim against CDS-Cumberland for violations of Plaintiff's First Amendment rights because CDS-Cumberland is an agency of the state entitled to sovereign immunity.  Under the Eleventh Amendment a state is immune from suit brought by a private party, regardless of the nature of the relief sought, unless the state consents to such a suit.  See, e.g., Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996) (internal citations omitted); Hans v. Louisiana, 134

---

[6] In total, The First Circuit remanded Counts II and III of Plaintiff's Original Complaint.  Count II alleged that CDS-Cumberland had an unconstitutional practice, custom, or policy of First Amendment retaliation and that it failed to adequately train Defendant Lori Whittemore regarding employees' First Amendment rights.  Count III of the Complaint alleged that State CDS Director Debra Hannigan failed to adequately supervise Whittemore.  On remand, Plaintiff is not pursuing claims against Hannigan.

[7] Because the Court declines Plaintiff's request to add Lori Whittemore to the case in her individual and official capacity, see supra, the Court considers Plaintiff's First Amendment claim only against CDS-Cumberland in analyzing Count I of the Amended Complaint and Count II of the Original Complaint.

U.S. 1 (1890); Irizarry-Mora v. Univ. of Puerto Rico, 647 F.3d 9, 11 n.1 (1st Cir. 2011) ("In the absence of consent, waiver, or abrogation, the Eleventh Amendment bars suit against states themselves regardless of the form of relief sought.") (internal citations omitted).  Further, "neither a state agency nor a state official acting in her official capacity may be sued for damages in a section 1983 action."  Johnson v. Rodriguez, 943 F.2d 104, 108 (1st Cir. 1991) (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989)).  The doctrine of sovereign immunity extends to entities considered to be an arm-of-the state.  See Irizarry-Mora, 647 F.3d at 11.  The question facing this Court, therefore, is whether CDS-Cumberland is an arm-of-the-state entitled to sovereign immunity under the Eleventh Amendment.

To determine whether an entity is an arm-of-the-state, the First Circuit has set forth a two-stage framework:

> a court must first determine whether the state has indicated an intention—either explicitly by statute or implicitly through the structure of the entity—that the entity share the state's sovereign immunity. If no explicit indication exists, the court must consider the structural indicators of the state's intention. If these point in different directions, the court must proceed to the second stage and consider whether the state's treasury would be at risk in the event of an adverse judgment.

Id. at 12 (internal citations omitted).

**a.   The First Stage:  Maine's Intention With Respect to CDS**

To determine whether the state "has indicated an intention" to share its sovereign immunity with the entity, the Court examines statutory provisions and case law to determine whether they evince a public role for the entity consistent with such a relationship.  Id. at 14.

The Maine Department of Education ("DOE") oversees a "statewide system" that provides "services to eligible children" with disabilities from birth through age five.  20-A M.R.S.A. § 7209(1).  As part of this statewide system, the Maine Legislature created regional CDS sites to fulfill the State's obligation under state and federal law to provide services to

children with disabilities.  See 20-A M.R.S.A. §§ 7001(1-A) & (4-A) (defining each CDS site as a "locally governed regional intermediate educational unit established to ensure the provision of services to children with disabilities").   More specifically, regional CDS sites fulfill the State's obligations under federal and state law to "[e]nsure that eligible children with disabilities, from birth to under 3 years of age, receive early intervention services, in accordance with the payment provisions established by the State." Id. at § 7209(8)(D).  For children aged three to five years, regional CDS sites "[e]nsure that eligible children with disabilities … receive free, appropriate public education services, in collaboration with school administrative units when possible."  Id. at § 7209(8)(E).

Regional CDS sites are governed by a board of directors "responsible for governance of [site] activities, including the management and oversight of its general operations."  Id. at § 7209(5).  By statute, each sites' board of directors "must include representatives of the regional offices of the Department of Health and Human Services, representatives of participating school administrative units, parents of children with disabilities and other community members…."  Id. at § 7209(5).   In circumstances where the regional CDS board of directors does not exist, the State CDS Director may step in and govern a regional CDS site.  See 20-A M.R.S.A. § 7209(1)(E) ("The [DOE] may assume temporary responsibility for operations at a regional site that fails to meet compliance requirements.").  During the time period relevant to this case, CDS-Cumberland did not have a board of directors and State CDS Director Hannigan governed CDS-Cumberland in lieu of the board of directors.  (See Child Development Services' Reponses to Plaintiff's Interrogatories (Docket # 36-3) ¶ 6 (stating that during July 2008, State CDS Director Hannigan governed CDS-Cumberland because there was no regional board of directors)).

14

Under the statewide system, a State official oversees and manages regional CDS sites by providing administrative guidance, policy, and funding.  The State director of early childhood special education (the "Director") administers a state intermediate educational unit that provides administration and coordination functions for the regional CDS sites.  See 20-A M.R.S.A. § 7209(3), (4).  The Director directs early childhood special education and "develop[s] statewide policies and procedures for carrying out federal and state laws and rules relating to … early intervention services and the provision of a free, appropriate public education to children from birth to under 6 years of age."  Id. at § 7209(4)(A), (B).

Regional sites have limited policymaking authority.  The State dictates regional sites' fiscal administration by requiring that "contracts, leases and agreements and any other instruments and arrangements that are necessary" for the sites to perform their duties be conducted using forms and procedures developed by the State.   Id. at § 7209(7)(B). Furthermore, the State funds regional sites by approving the provision of an annual entitlement plan and budget to sites' boards of directors.  Id. at § 7209(1)(B) & (6).  Where the regional sites' annual entitlement plan or budget does not comply with state standards, the DOE requires the regional site to revise and resubmit the entitlement plan and budget within a reasonable time determined by the State.  20-A M.R.S.A. § 7209(1)(B)(2).  In addition, regional sites such as CDS-Cumberland must abide by job classifications, pay scales, and personnel policies established by the State.  Id. at § 7209(7)(A).  The State also establishes extensive policies and procedures, which regional cites must adhere to and which must be included in their annual entitlement plans submitted to the State.  These policies and procedures cover statewide salary and benefits administration systems for CDS personnel, see § 7209(3)(A) & (B), payroll functions for CDS personnel, see § 7209(3)(B), a statewide template for regional site contracts

with service providers, see § 7209(3)(E), and program accountability standards for compliance with federal mandates that must be included in each regional sites' annual entitlement plan, see § 7209(3)(F).

In 2006, the Maine Legislature amended Title 20-A, the statute governing CDS.  Plaintiff seizes on these amendments to support her argument that regional CDS sites such as CDS-Cumberland are local educational agencies rather than an arm of the State.   Prior to the amendments, Title 20-A provided that CDS was "established as a body corporate and politic and as a public instrumentality of the State…."   See Child Development Services—Cumberland County v. Attorney General, 760 A.2d 630, 631, 632 (Me. 2000) (holding that "regional CDS sites are 'agencies of the State'").   When the statute was rewritten, the Legislature described each CDS regional site as a "locally governed regional intermediate educational unit established to ensure the provision of services to children with disabilities" and placed the "body corporate and politic" language in the subsection describing the state intermediate educational unit, an entity one step above regional CDS sites in the organizational hierarchy.   See 20-A M.R.S.A. §§ 7001(4-A), 7209(3).   Considered in the context of the statute as a whole, this revision does not indicate an intention to consider that regional CDS sites are anything other than an arm of the state for the purpose of Eleventh Amendment sovereign immunity analysis.   In fact, the statute defines each CDS regional site as an "intermediate educational unit … that is a public entity, other than a local educational agency, under the general supervision of the [DOE]."   Id. at § 7001 (2-B) (emphasis added).   Thus, the statute is clear that CDS regional sites are not local educational agencies.[8]

---

[8]Plaintiff argues that under Maine law each regional CDS site is classified as a "local educational agency."   See 20-A M.R.S.A. § 7001(2-B) (stating that regional CDS sites are "considered a local education agency under federal law").  Each local educational agency, Plaintiff notes, is categorized as a "school administrative unit" under Maine law.  See id.  By statute, a "school administrative unit" is the "state-approved unit of school administration and

16

In addition, the Maine Supreme Judicial Court has recognized that regional CDS sites are an arm of the state. In <u>Child Development Services—Cumberland County v. Attorney General</u>, 760 A.2d 630, 632 (2000), the Supreme Judicial Court concluded that "regional CDS sites are state agencies" for the purpose determining whether the State Attorney General must appear on behalf of regional CDS sites. Plaintiff argues that because the case was decided prior to the 2006 amendments, its central holding is no longer controlling. The Court finds Plaintiff's argument unavailing.[9] In concluding that the regional CDS sites are "agencies of the State," the Supreme Judicial Court discussed several dispositive factors that remain important today, including – that regional CDS sites are "primarily funded by contracts with the State," that "the DOE has significant supervisory powers over the sites," that "the DOE is required to review and approve the budgets of the regional sites." <u>Id.</u> at 632.

Based on the statutory scheme and the relevant case law, this Court concludes that the structural indicators – namely, relevant State statutes and case law – indicate an intention that the regional CDS sites share the state's sovereign immunity.

---

includes a municipal school unit." <u>See</u> <u>id.</u> at § 1.26. Accordingly, Plaintiff argues that regional CDS sites are equivalent to local municipal school units and, therefore, that regional CDS sites are local units not entitled to sovereign immunity. Plaintiff's argument misconstrues § 7001(2-B) and § 1.26. Section 7001(2-B) specifically states that an intermediate educational unit is "<u>other</u> than a local educational agency." <u>Id.</u> (emphasis added). Furthermore, § 7001(2-B) distinguishes a CDS site from a local educational agency by stating that CDS "sites are organized as intermediate educational units" and that in "this State, a local educational agency is a school administrative unit." Finally, § 1.26 provides an exclusive list of school administrative units and CDS sites are not on the list, indicating that the Legislature does not consider regional CDS sites to be a school administrative unit under State law.

[9] As Plaintiff notes, one purpose of the 2006 amendment was "to reorganize the responsibilities of the Department of Education, the state intermediate educational unit and the 16 regional [CDS] sites…." <u>See</u> Office of Policy and Legal Analysis, Joint Standing Committee on Education and Cultural Affairs, Public Law 2005, chapter 662, LD 1772, Committee Amendment A (S-585) (2006), <u>available at</u> www.maine.gov/legis/opla/EDUsum06.pdf (last visited Jan. 30, 2012). The purpose of the reorganization was not to provide regional CDS sites with greater autonomy from the State; rather the amendment sought "to enhance the effectiveness of early childhood special education programs and to achieve efficiencies of cost…." <u>See</u> <u>id.</u>

**b.  The Second Stage:  Impact on the State's Treasury**

Given this conclusion, it is unnecessary for the Court to consider whether the State's treasury would be at risk in the event of an adverse judgment.  See Irizarry-Mora, 647 F.3d at 12. Nonetheless, in an abundance of caution, the Court notes that an adverse judgment against CDS-Cumberland would impact the State treasury, further supporting the status of CDS-Cumberland as an arm of the state.  In fact, regional CDS sites receive all of their funding through entitlement agreements with the DOE.  See 20-A M.R.S.A. § 7209.  (See also CDS's Responses to Plaintiff's Requests for Admission (Docket # 36-1) at 3.)  Accordingly, if a CDS site runs out of money, it must go to the State to ask for more.  See § 7209.  (See also CDS's Responses to Plaintiff's Requests for Admission at 3.)  Plaintiff argues that because CDS-Cumberland has multiple funding sources, an adverse judgment against it would not require CDS-Cumberland to ask the State treasury to pay the court judgment.  Moreover, Plaintiff contends, the State is not required to pay for any CDS site liability:  if CDS-Cumberland suffered an adverse judgment the State could simply refuse a request for additional funding.[10]  This argument misses the mark.  CDS-Cumberland's "status cannot turn on whether its budget shows enough non-[State] income to allow it, in theory, to pay a court judgment."  See Irizarry-Mora, 647 F.3d at 17.  Allocating any portion of CDS-Cumberland's revenues to court judgments "not only would dilute the impact of the public funds [it] receives, but such damage awards also would diminish the [site's] ability to comply with its statutory mission" to provide services to children with disabilities.  See id.

---

[10] Plaintiff also contends that the Entitlement Agreement between CDS-Cumberland and the DOE provides a clear statement of the State's intention that CDS-Cumberland (the "Provider") is not an agency of the State.  Specifically, Rider B to the Entitlement Agreement states that "the Provider shall act in the capacity of an independent contractor and not as officers or employees or agents of the State."  See Agreement to Purchase Services, Approval of Annual Entitlement Plan, Rider B ¶ 4.  Plaintiff's argument again misses the mark.  As directed by the First Circuit, the Court analyzes the structure of the entity and case law to determine the State's intention.  See Irizarry-Mora, 647 F.3d at 12.  Based on its analysis of Maine law, the Court finds that regional CDS sites are structured within a statewide system clearly indicating that regional CDS sites are considered an arm of the state.  Rider B to the Entitlement Agreement between two state agencies does not defeat the clear structural indicators of the applicable statute or relevant case law.

Based on an analysis of the factors set forth in the First Circuit's test in <u>Irizarry-Mora</u>, the Court rules that CDS-Cumberland is an arm-of-the-state for the purposes of Eleventh Amendment sovereign immunity and, therefore, that the Court lacks subject-matter jurisdiction over Plaintiff's Section 1983 claims against CDS-Cumberland. See <u>id.</u> at 12, 17. Accordingly, Count II of Plaintiff's Original Complaint is DISMISSED. For the same reasons, the Court rules that Count I of Plaintiff's proposed Amended Complaint is futile. Therefore, Plaintiff's First Motion to Amend and Second Motion to Amend are DENIED with regard to Count I of the proposed Amended Complaint.

**2. Retaliation Under the Americans With Disabilities Act**

In Count III of her Amended Complaint, Plaintiff alleges that CDS-Cumberland declined to renew her contract in retaliation for Plaintiff engaging in activity protected by Title II of the ADA. The Court first addresses Plaintiff's retaliation claim and then turns to analyzing whether CDS-Cumberland enjoys sovereign immunity. See <u>Buchanan v. Maine</u>, 469 F.3d 158, 172 (1st Cir. 2006) ("before the immunity issue is reached, the court must first address whether plaintiff's Title II claim fails on the merits"). Although Plaintiff entitles Count III of the proposed Amended Complaint as a "Violation of Title II of the Americans with Disability Act," Count III actually sets out a claim for retaliation under Title V of the ADA.[11]

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The anti-retaliation provision contained in Title V provides that

---

[11] Moreover, rather than arguing that she alleges a claim under Title II of the ADA, Plaintiff's briefings in support of her proposed Amended Complaint argue that Plaintiff has "adequately plead the elements of a retaliation claim under the ADA...." (See Plaintiff's Objections to Defendant's Second Motion to Dismiss (Docket # 39) at 10.)

"[n]o private or public entity shall discriminate against any individual who has opposed any act or practice made unlawful by this part or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  § 12203(a).

To establish a claim of retaliation, a plaintiff must show that "(1) she engaged in protected conduct, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse employment action."  Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 106 (1st Cir. 2007).

The parties agree that Plaintiff has adequately pled the second prong; thus, the court analyzes the first and third prongs only.  As to the first prong, Plaintiff alleges that she engaged in protected conduct through "advocacy to parents concerning the failure of CDS-Cumberland to comply with its obligations to children with disabilities under IDEA."  (Amended Complaint (Docket # 38-1) ¶ 65.)  In other words, Plaintiff alleges that she advocated for disabled students who were receiving inadequate public services – namely, educational services provided by CDS-Cumberland – which are covered under Title II of the ADA ("Title II: Public Services").  See 42 U.S.C. §§ 12131, et seq.; Barker v. Riverside County Office of Educ., 584 F.3d 821, 828 (9th Cir. 2009) (holding that a teacher has standing to sue the County Office of Education for retaliation under the ADA where she alleged that she was constructively discharged after advocating for the rights of disabled students).  Indeed, public services provided to disabled students are the focus of Title II of the ADA. See §§ 12131, et seq.  Thus, Plaintiff's claim was appropriately brought under Title II.  By alleging that she has taken an affirmative step to advocate to parents concerning the rights of children with disabilities, Plaintiff has alleged that

she engaged in protected activity.[12]   See Barker, 584 F.3d 827-28; Montanye v. Wissahickon Sch. Dist., 218 Fed.Appx. 126, 131 (3d Cir. 2007) (stating that protected activity under the ADA includes "affirmative action in advocating for, or protesting discrimination related to, unlawful conduct by others"); see also Reinhardt v. Albuquerque Pub. Sch. Bd. of Ed., 595 F.3d 1126 (10th Cir. 2010) (holding that a teacher's "attempt[s] to protect the rights of special education students constitutes protected activity under the Rehabilitation Act").

Turning to the third prong, causal connection, Plaintiff has shown sufficient facts to establish a causal connection between her advocacy for disabled children and the adverse employment action taken against her.   Specifically, Plaintiff alleges that "[i]n May 2008 … Whittemore called Plaintiff to complain that Plaintiff was 'out to get her' with the advice she was giving parents about contacting advocacy groups." (Amended Complaint ¶ 42.)  Then, in a letter dated July 29, 2008, "Plaintiff was informed, without explanation, that CDS-Cumberland had decided not to renew her contract due to expire on September 1, 2008." (Id. ¶ 43.)   This sequence of events, which includes Plaintiff's advocacy, a telephone call from Whittemore complaining about Plaintiff's advocacy, and Plaintiff's subsequent non-renewal satisfies the pleading standard with regard to the causal connection.   See Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (examining the timing and the circumstances surrounding the termination to conclude that plaintiff satisfied the causation prong); Soileau v. Guilford of Me. Inc., 105 F.3d 12, 16-17 (1st Cir. 1997) (examining both the timing of the termination and the "larger picture" to decide whether a causal connection existed).   While the two-months between Plaintiff's telephone call with Whittemore and receipt of her non-renewal letter constitutes a gap

---

[12] Defendant contends that Plaintiff's proposed Amended Complaint fails to allege an ADA retaliation claim because it does not specify how Plaintiff's alleged conduct opposed any practice made illegal by the ADA.  Plaintiff satisfies the pleading standard at the motion to dismiss stage because by alleging that CDS-Cumberland failed to provide adequate services to children with disabilities pursuant to the mandates of IDEA, Plaintiff alleged that the children were receiving inadequate public services.

in time, the Court finds the timing of the non-renewal to be relevant because Plaintiff received word that her contract would not be renewed just two days before her contract was set to expire. Accordingly, the Court finds that Plaintiff has stated a claim for retaliation under Title V of the ADA.

Defendant contends that Plaintiff's retaliation claim must be dismissed because CDS-Cumberland is an arm-of-the-state entitled to sovereign immunity. Neither the Supreme Court nor the First Circuit has yet decided whether Eleventh Amendment sovereign immunity bars claims brought against state entities pursuant to Title V of the ADA. The majority of courts in this circuit and in other circuits to have considered this issue first examine whether the underlying violation is predicated upon Title I or Title II of the ADA. See, e.g., Cardona Roman v. Univ. of Puerto Rico, 799 F. Supp. 2d 120, 127 (D.P.R. 2011) (granting sovereign immunity when retaliation claim was based on Title I); McCollum v. Owensboro Cmty. & Tech. Coll., No. 4:09CV-00121-M, 2010 WL 5393852, at *3 (W.D.Ky. Dec. 22, 2010) (internal citations omitted) (denying sovereign immunity in retaliation action by community college instructional specialist against community college for advocacy on behalf of disabled students); Chiesa v. New York State Dep't of Labor, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009) ("Applying the Title I and Title II conditions on liability to Title V ensures state employers receive the degree of protection Congress intended. If a state is immune from underlying discrimination, then it follows that the state must be immune from claims alleging retaliation for protesting against discrimination."); see also Worley v. Louisiana, No. 10–3313, 2012 WL 218992, at * 4 (E.D. La. Jan. 25, 2012) (collecting cases and stating that "this Court is similarly persuaded that Congress failed to validly abrogate the Board's Eleventh Amendment immunity with respect to Title V retaliation claims predicated on violations of Title I").

Thus, where the underlying claim is predicated on alleged violations of Title I of the ADA, then the Title I immunity recognized in Bd. of Trustees of Univ. of Alabama v. Garrett, 531 U.S. 356 (2001), is generally extended to ADA Title V retaliation claims. See, e.g., Demshki v. Monteith, 255 F.3d 986, 988–89 (9th Cir. 2001). Where the underlying claim is predicated on alleged violations of Title II of the ADA, then the Title II abrogation of immunity is extended to ADA Title V retaliation claims. See Demby v. Maryland Dep't of Health & Mental Hygiene, 2009 WL 415265, at *1 (D. Md. 2009) (granting leave to amend complaint to state an ADA retaliation claim related to a Title II claim because no sovereign immunity exists for ADA retaliation claims based on Title II); Sarkissian v. West Virginia Bd. of Governors, No. 1:05CV144, 2007 WL 1308978, at *6-8 (N.D.W.Va. May 3, 2007) (denying Eleventh Amendment immunity for ADA Title V retaliation claim, at least where claims are predicated on alleged violations of Title II).

The Supreme Court has held that Congress validly abrogated state sovereign immunity with regard to certain claims brought under Title II of the ADA. See United States v. Georgia, 546 U.S. 151, 159 (2006) ("[I]nsofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."); Tennessee v. Lane, 541 U.S. 509, 533-534 (2004) (Title II validly abrogates state immunity as to cases involving the right of access to the courts). Circuit courts relying on both Supreme Court cases have held that Title II of the ADA validly abrogates sovereign immunity with respect to public education. See e.g., Bowers v. NCAA, 475 F.3d 524, 555-556 (3d. Cir. 2007); Toledo v. Sanchez, 454 F.3d 24, 40 (1st Cir. 2006); Ass'n for Disabled Americans, Inc. v. Florida Int'l Univ., 405 F.3d 954, 957-959 (11th Cir. 2005). See also McCollum, 2010 WL 5393852, at *3.

Here, it is clear that Plaintiff's Title V retaliation claim arises under Title II. Plaintiff's complaint clearly pleads that she suffered retaliation in response to her efforts to advocate to parents regarding CDS-Cumberland's failure to provide public educational services to disabled children, thus extending the Supreme Court's analysis of ADA Title II public services claims in Lane to Plaintiff's Title V retaliation claim. See McCollum, 2010 WL 5393852, at *3 (citing Garrett, 531 U.S. at 363; Lane, 541 U.S. at 533-34).

### 3. Retaliation Under § 504 of the Rehabilitation Act

In Count II of her proposed Amended Complaint Plaintiff alleges that Defendants impermissibly terminated her position with CDS-Cumberland in retaliation for Plaintiff engaging in activity protected by § 504 of the Rehabilitation Act, 29 U.S.C. § 794. Although the ADA and the Rehabilitation Act are not identical, the First Circuit has recognized that a separate analysis of § 504 claims is not necessary when an ADA claim is being considered on the same grounds. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 12 n.1 (1st Cir. 2004) ("The same standards … apply to claims under the ADA and under the Rehabilitation Act.") (citing Oliveras-Sifre v. Puerto Rico Dep't of Health, 214 F.3d 23, 25 (1st Cir. 2000)); Vazquez v. Municipality of Juncos, 756 F. Supp. 2d 154 (D.P.R. 2010). Accordingly, the Court does not find it necessary to repeat its reasoning with regard to Plaintiff's retaliation claim under § 504. As stated previously, Plaintiff has stated a claim for retaliation because she alleged that her employment contract was not renewed because she advocated for disabled children who were receiving inadequate public services from CDS-Cumberland. See supra, III.D.2; see also Reinhardt, 595 F.3d at 1132; Barker, 584 F.3d at 824-25; Montanye, 218 Fed.Appx. at 131; Weber v. Cranston School Committee, 212 F.3d 41, 48 (1st Cir. 2000) (indicating that the Rehabilitation Act protects "non-disabled individuals suing because of retaliation for attempts to vindicate the rights

of disabled persons"); <u>Sweet v. Tigard-Tualatin Sch. Dist.</u>, 124 Fed.Appx. 482, 485 (9th Cir. 2005) (holding that a public school psychologist's complaints regarding potential IDEA violations were protected from retaliation under § 504).  Accordingly, this Court rules that Plaintiff's Amended Complaint states a claim for retaliation under § 504 of the Rehabilitation Act.

Because the State has applied for and accepted funds under § 504 of the Rehabilitation Act, Defendant makes no Eleventh Amendment sovereign immunity argument with regard to Plaintiff's § 504 retaliation claim.  See <u>Nieves-Marquez v. Puerto Rico</u>, 353 F.3d 108, 127-28 (1st Cir. 2003).  Accordingly, Plaintiff states a claim for retaliation against CDS-Cumberland under the Rehabilitation Act.

## III.   CONCLUSION

For the reasons stated above, the Court hereby DENIES Plaintiff's Motion to Strike (Docket # 43).  Plaintiff's Motion to Amend (Docket # 33) is DENIED IN PART as to Count I and DENIED IN PART as moot as to Counts II and III.   The Court hereby GRANTS Defendant's Motion to Dismiss (Docket #37) as to Counts II and III of Plaintiff's Original Complaint.  Furthermore, Plaintiff's Motion to Modify Order and Second Motion to Amend (Docket # 38) is GRANTED IN PART as to Counts II (Rehabilitation Act) and III (ADA) against CDS-Cumberland and DENIED IN PART in all other respects.  Therefore, the case shall proceed on these two counts against Defendant CDS-Cumberland.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 2nd day of February, 2012.